770 So.2d 844 (2000)
STATE of Louisiana
v.
Douglas WHITTON.
No. 99-KA-1953.
Court of Appeal of Louisiana, Fourth Circuit.
September 27, 2000.
*845 Harry F. Connick, District Attorney, Jane L. Beebe, Assistant District Attorney, *846 New Orleans, Louisiana, Counsel for Plaintiff-Appellee State of Louisiana.
Christopher A. Aberle, Louisiana Appellate Project, Mandeville, Louisiana, Counsel for Defendant-Appellant Douglas Whitton.
Court composed of Chief Judge ROBERT J. KLEES, Judge WILLIAM H. BYRNES, III, and Judge MIRIAM G. WALTZER.
KLEES, Chief Judge.
By grand jury indictment dated December 11, 1997, defendant, Douglas Whitton was charged with four counts of first degree murder from which he pleaded not guilty. The trial court granted defendant's motion to suppress the confession; but, this court granted the State's writ application and reversed the trial court's ruling. State v. Whitton, 98-1587 (La.App. 4 Cir. 8/12/98), unpub., writ denied 98-2413 (La.11/11/98), 728 So.2d 871. On February 22-26, 1999, defendant was tried by a twelve-member jury that found him guilty as charged on all four counts and recommended that he be sentenced to life imprisonment on all four counts.[1] On March 5, 1999, the trial court denied defendant's motion for new trial; and after waiving all delays, defendant was sentenced in accordance with the jury's recommendation to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. This appeal followed.

STATEMENT OF THE FACTS
Jamie Rauch testified that on the night of October 16, 1997, she and her boyfriend met defendant on the Moonwalk. She said that defendant told her he had done something bad. A day or two later, she was at the Drop-in Center doing laundry when she saw a newspaper article about four murders and was pressured to tell the police where defendant was. She went with the police to the warehouse where she, her boyfriend, and defendant were staying and convinced defendant to come out to help her carry a bag of dog food at which point the police arrested defendant.
David Smith, who was Ms. Rauch's boyfriend, testified that when he saw defendant on October 16, 1997, defendant was carrying a duffel bag. Smith said that he had known defendant for four months and that on October 16, they hung out together and then stayed in an apartment on Decatur Street. On the following afternoon, defendant told Smith that he had done something wrong and was worried and scared. That night, after defendant had dinner with someone else, he went to the "squat," a warehouse at Piety and Chartres, where Smith and Rauch lived. Smith testified that the next day, a Saturday, defendant told him that he, defendant, had struck the woman he had been living with because she would tease him and pull his hair. He further told Smith that he smashed the woman's skull and stabbed her with a steak knife and a frog gig. Defendant then told Smith that he killed a roommate who had come home and saw the woman's body when the roommate came after him with a knife. Smith testified that defendant said that he beat the roommate with a rock and that he then killed the woman's little boy and husband. He told Smith that he killed the husband by hitting him in the head with a brick and that he cut the throats of all four people. He also told Smith that he took a check or checkbook from the house so that he could feed himself and stay in a hotel.
Joie Cutrer testified that on October 17, 1997, he received a call to proceed to 4026 Baudin Street. The police had received a report about a missing man from his co-workers who had not seen him for a week and who had gone to his home in an effort to locate him. Cutrer noticed that the mail was still in the mailbox and that the door was locked. He then walked down *847 the alleyway where he saw a partially open window that had a fan in it; and, as he got closer, he saw flies at the window and encountered the smell of a decaying human body. Cutrer got a ladder and climbed into the window after removing the fan. He saw blood on the floor; and, when he entered a bedroom at the rear of the house, he found the body of a white male on the floor and the body of a white female on the bed. Cutrer then secured the residence and called for assistance. When Sergeant Guidry from the Crime Lab arrived, they reentered the house, which was in total disarray. Cutrer said that there were hundreds of flies and maggots all over the bodies.
Stephanie Pellegrini testified that she worked at the Stone Center with Owen Reeves and knew that he had been living on Baudin Street for the past nine months with Gail and her son Joey. She stated that it was unusual for Reeves to miss work for an extended period and that when he did miss work, he would call. She further stated that in October 1997 when Reeves had not shown up for a week and had not called, she and another co-worker, Mickey Reyes, went to his house so that she would have the address to give to the police. They saw that the mail was still in the mailbox, and they walked down the alleyway at the side of the house. As they got to the last or second to last window, they saw flies and smelled a horrible odor coming from the house; and, they used a neighbor's phone to call the police. Both Ms. Pellegrini and Reyes stated that they had last seen Reeves on the previous Friday.
Pat Bailey, shop supervisor at the Stone Center, testified that he had last seen Reeves on the previous Saturday, October 11. Records showed that Reeves arrived for work at 8:05 a.m. and left at 12:18 p.m. Bailey stated that Reeves was alone when he left work that day and that Reeves was on foot. Bailey testified that Reeves said he was going to a meeting.
Xavier Bowie, an employee of the Stone Center, testified that he occasionally visited Reeves at his home, which he described as neat and clean. He further testified that in October 1997, he went to Reeves' home on Tuesday afternoon and Wednesday morning when Reeves had not shown up for work. He said that other co-workers went to Reeves' home on Thursday; and on Friday when Reeves had not called, Bowie said that he told his boss to call the police because it was not like Reeves to miss days and not call. He stated that he had last seen Reeves the previous Saturday and that he was supposed to take him home but did not because Reeves was with a customer. Bowie testified that when he went to the house on that Wednesday morning to look for Reeves, he saw the mail and the curtains moving. He walked to the side of the house and saw the fan blowing. He did not notice any tears or bloodstains on the curtains.
Marion Legrand testified that she taught Joey Whitehead at A. D. Crossman Elementary and that the last time she saw him was October 10, 1997.
Julie Chen testified that she worked at Sweet's Inn Motel on Tulane Avenue, and she identified a registration card from the motel. The card was dated October 10, 1997, 1:15 a.m.; and, it was in the name of Douglas Whitton. She stated that she did not know when he checked out of the motel.
James Brown, who lived at 4034 Baudin, testified that Owen Reeves, Gail Coulon, and her son Joey Whitehead had lived next door to him for a couple of years. He remembered when two people from the Stone Center were looking for Reeves and that he gave them permission to walk down his driveway to look at the back part of the house. He stated that they called to him and pointed out the flies on the window and the smell. He called the police; and, when the officer arrived, he lent the officer a ladder to climb into the window. Brown testified that two men, one of whom was tall and one of whom was fat, lived *848 with Reeves, Coulon, and her son. He identified defendant as the fat one.
Craig Peel, who lived across the street from 4026 Baudin, testified that he used to walk Joey Whitehead to school so as to save his mother a trip and when he did not see them, he did not pay any mind. He further testified that in the days before the bodies were found, he saw defendant at the house, once with the door open and watching television and the other time with a green duffel bag. He thought that the day he saw defendant with the duffel bag was on the Wednesday before the Friday that the police found the bodies. He did not recall seeing or hearing anything unusual, although he did notice the mail had not been picked up.
Rainey Lutyhe testified that she lived in one half of a shotgun double and that Reeves, Ms. Coulon, her son, and defendant lived in the other half. She said that Reeves had lived there for a couple of years and that Ms. Coulon and her son had lived there for about six months. With regard to the Saturday before the bodies were discovered, she did not recall hearing any loud noises, screaming, or struggling from next door. She stated that this was unusual because it usually a noisy house where there was always screaming and hollering. She further stated that she left around 11:00 a.m. that Saturday to go to a wedding. She did not see defendant that day or on the following days. She also did not see or hear any of the other occupants, but she did hear footsteps at night. She stated that she began to smell a terrible smell on the following Tuesday and thought it was dead rats.
Detective John Ronquillo testified that he and Detective Marco Demma proceeded to 4026 Baudin and found four bodies. He stated that the front room was in disarray, and a blood-stained knife wrapped in newspaper was found in that room. In the second room, he saw a child's desk, a bed, and a dresser containing children's clothing. He also found a frog gig in that room. In the third room, he found the bodies of Gail Coulon and Owen Reeves. Ms. Coulon, who was lying on a bed, was nude from the waist down; and, it appeared that she had sustained a severe head injury and that her throat was cut. She also had what looked like prong marks in her chest. Reeves' body was next to the bed, and he had sustained a severe laceration to his neck and had been beaten about the head. Ronquillo said that the wounds on Reeves' head looked like they were made with a rock that was found in the front room. He also found a cinder block in the third room. In the kitchen, he found a bent and bloody knife in the sink. The last room was a utility room, but it had two beds in it. On one of the beds was the body of Joseph Donovan who appeared to have sustained a severe head trauma and whose throat had been cut. Ronquillo also found the body of nine year old Joey Whitehead wrapped up in a quilt. He had two stab wounds to the chest, and his throat had been cut.
Louis Schwander testified that he worked with Joseph Donovan at Orleans Sheet Metal Works and Roofing. He said that the last time he saw Donovan was a Friday and that Donovan was supposed to come to work the next day but did not appear.
Chang Tsui Vu testified that she worked at the Century Hotel on the Westbank Expressway in Gretna, and she identified a guest registration card in defendant's name from October 15, 1997.
Dr. Richard Tracy performed the autopsies on the four victims. He testified that Ms. Coulon died of blunt force injuries to the head and that her body was in advanced decomposition. He also found five stab wounds in her chest, and he stated that these wounds were inflicted after death because there was no bleeding. She also had a cut across the front of her neck that was consistent with postmortem injury. He testified that her head injuries occurred on the left side and were inconsistent with their having been given while *849 she lay face up in bed. As to Donovan, Tracy stated that he died from blunt force injuries to the head and that there appeared to be thirteen individual blows. He further stated that Donovan, who was also in a state of advanced decomposition, was struck in three patterns behind the left ear, in the forehead, face and jaw, and in the left temple area. Donovan also had a shallow slash across the front of the neck. Tracy testified that Joey Whitehead was stabbed four times and that the wound to the neck was the fatal one. As to Reeves, Tracy testified that he died from blunt force injuries to the head. One injury was to the back of the head, and one was to the right temple. Reeves also had a slash across the front of the neck. With regard to all four victims, Tracy found a heavy population of maggots.
Malinda DuRousseau testified that she lived three doors down from the murder scene and that she knew Ms. Coulon, her son, and Reeves. She also knew that defendant was living with them. She testified that the last time she saw her neighbors was on a Friday and that on the Tuesday morning subsequent to that Friday, defendant came to her house. She said that he asked her if she was James' girlfriend and that she told him that James was her sister's boyfriend. She further testified that defendant said, "Okay" when she told defendant that her sister and the sister's boyfriend would be back in a little while. She stated that he then returned to his house. She also stated that defendant was the only person she saw coming to and going from the house until Wednesday in the week before the police found the bodies. She stated that the last time she saw Reeves was on Friday afternoon and that he was carrying a bag of groceries. She last saw Ms. Coulon on Friday morning, and she last saw Joey on Friday evening when he was playing with her daughter and nephew.
Jimmy Benz testified that Joey Whitehead was his best friend and that they played together every day. On the Friday that he last saw Joey, Jimmy stated that he got home from school at 3:30 and that he, his cousin, and Joey played basketball in Joey's backyard until about 5:00[2]. He said they played for two to three hours until the mosquitoes got bad and that Joey went inside. Jimmy and Jennifer, his cousin, started to walk home when they heard arguing; and, he told Jennifer that they should see if Joey was in trouble. While Jennifer stayed in the front of the house, Jimmy walked up to the kitchen window where he heard Ms. Coulon and Reeves telling defendant to get out of the house. He stayed there for a about five minutes, but ran off after Jennifer said that they were going to get into trouble. Jimmy testified that the next morning, he went over to Joey's house at 11:00 and knocked on the door. Jimmy further testified that he heard "boom, boom, boom," and that defendant then answered the door. Defendant told James that they had gone to Mississippi and then slammed the door shut. He went back to Joey's house at 4:00, and he testified that the same happened as happened when he went to Joey's earlier that day. He did not go back to Joey's until Monday afternoon when he got back from school. He and Jennifer went to Joey's where he knocked on the door, and Jimmy stated that when he knocked the door opened a little bit. James looked inside and saw an Indian curtain separating the front room from Joey's room. He said that the curtain, which was blue, had little red dots on it. He then heard "boom, boom, boom" again; and, defendant came to the door and repeated that everyone was in Mississippi. He and Jennifer ran home; but, he went back the next day with Jennifer and his mother to return a toy that belonged to Joey. Jimmy testified that he went to back door instead and placed the toy on the step and that he heard the booming sound again. He said that defendant opened the door and repeated that everyone *850 was in Mississippi. Defendant shut the door, and he ran back to the front of the house where his mother and Jennifer were. He did not go back to the house again.
Jennifer DuRousseau testified that he knew and played with Joey Whitehead with her cousin, Jimmy Benz. She said that after the last time she and Jimmy played with Joey and he went in his house, she and Jimmy heard hollering coming from inside the house. She stayed at the front of the house while Jimmy went to the side of the house. They then went home, and she and Jimmy went back to Joey's on the following Monday. Jimmy knocked on the door which then flew open. She saw a blanket with "red stuff" on it, and she said that defendant ran to the door and told them that everyone was in Mississippi. After defendant slammed the door shut, she and Jimmy went home. They, along with Jimmy's mother, went back to Joey's house the next day so that Jimmy could put a toy on the back steps. She said that she stayed by Mr. Brown's gate while Jimmy put the toy on the steps. She did not see or hear anything else.
Marlene Maher, Jimmy's mother, testified she knew Gail Coulon, Owen Reeves, and Joey Whitehead. She stated that defendant moved into 4026 Baudin in August of 1997 and that Joe Donovan moved in about three or four weeks after that. She identified the piece of stone found inside the house as having been part of a column on the front porch. On the last Friday that she saw Ms. Coulon, she said that they made plans for Ms. Maher to tutor Joey in math on Saturday morning. On that Saturday morning, she sent Jimmy over to get Joey at around 11:00; but, Jimmy came back home alone. He again came back without Joey when she sent him back to Joey's later that day. She did not see any of her neighbors on subsequent days; and, on the following Tuesday, she, Jimmy, and her niece went over to Joey's to return a toy. As her son placed the toy on the back steps, she heard defendant yell at her son that he did not want him to go back down there and that everyone was in Mississippi. She hollered back to her son to tell defendant to shut up and that he was just putting a toy on the step. She saw defendant the next day sitting on the porch with a green duffel bag. She saw him at around 5:30 pick up the bag walk toward Pierce Street, and this was the last time she saw defendant.
Edward Delery, head of the Forensic Light Unit of the Crime Lab, testified that he went to crime scene to look at various blood print patterns that were on objects in the house, particularly one on the washing machine. He took photographs and used an electrostatic dust lift and a rubber lift to get impressions of the blood prints from various places in the house.
Glen Burmaster of the Latent Fingerprint Unit testified that many of the prints were not suitable for identification. He also stated that none of the prints that were suitable for comparison, including the bloody print found on the washing machine, matched defendant's prints. He did not have prints from any of the victims to use for comparison due to the decomposition of the bodies.
Joseph Tafaro analyzed hairs found at the scene with those of the victims and defendant; and, he concluded that hairs found on two shampoo bottles were those of defendant and that those hairs had minute traces of blood on them. He said that hairs on the bent steak knife and a brown-handled knife were either Gail Coulon's or Joey Whitehead's. He also found microscopic traces of blood on hair that was found in the warehouse where defendant was arrested. He could not type any of the blood.
Paula Eady, assistant vice-president of Hibernia National Bank, testified that Owen Reeves had an account with Hibernia. She identified four checks that had been written on Reeves' account, and all four checks were made payable to defendant. She stated that the checks were *851 cashed at the bank. Two checks were cashed on October 13, 1997; and, the other two were cashed on October 14 and 15.
James Dupuis was qualified as an expert in document examination. He took a handwriting exemplar from defendant, and he compared it with the signature on the motel registration cards. He found that it was highly probable that they were of common authorship. He also compared the exemplar with the handwriting, including the signature of Owen Reeves, on the four checks. He concluded that all four checks were of common authorship with the exemplar.
Chester Meek, who was qualified as an expert in forensic entomology, testified that forensic entomology involved the study of what species of insect come in at the beginning of the decomposition process and those species that are found in the later stages of decomposition. He further testified he received several containers of insects that were taken from the bodies of the four victims. He studied the insects and concluded that the oldest larvae were six days old which meant that the insect eggs were laid on the Saturday before the bodies were found. He stated that flies do not become active before dawn. He admitted that he could not give the exact hour of death and could not say whether the bodies were available to the flies before dawn on that Saturday.
Detective Marco Demma testified that he arrived at 4026 Baudin at 10:24 a.m. on October 17 and that he found the shotgun home in disarray. He saw a blue blanket or quilt covering the opening between the first room and the next room, which was Joey Whitehead's bedroom. He also saw a knife on the dresser in Joey's room and noticed that the mattress from Joey's bed was in the front room. He found a gig pole on a love seat in Joey's room and saw a blood trail that looked like a drag mark extended from the front room to the second room and then into the hallway. The bloodstains had a white cleansing powder sprinkled over them; and, he found house-hold cleaning products, as well as personal cleaning products, in the bathroom. There was a mop in the toilet, and there was blood on the floor. Demma went to the next room, a bedroom, where he found the bodies of Gail Coulon and Owen Reeves. Ms. Coulon's body was on the bed, and Reeves' body was on the floor. He saw blood on the doorway leading from the bedroom to the kitchen. He found a bent, bloodstained knife in the kitchen sink. He then went into the last room of the house where he found the bodies of Joey Whitehead, wrapped in a bedspread, and Joseph Donovan, who was clad in only his underwear, lying on a mattress. There was blood spattered on the wall, and a knife was found on the mattress after Donovan's body was removed. A fourth knife was found in the front room underneath scattered newspapers.
Demma testified that after speaking with neighbors, defendant was developed as a suspect; and, on October 18, 1997, he was contacted by Detective Michael Eskine who had information on defendant's whereabouts. He went to an abandoned warehouse at Piety and Chartres where he saw defendant leaving with a female subject. Demma searched the warehouse and found a green duffel bag, some cut hair, and a knife. Defendant was placed under arrest and informed of his rights. Demma stated that defendant appeared to understand his rights and that again he informed defendant of his rights at the homicide office. Defendant signed a waiver of rights form, and Demma testified that he did not suggest a statement to defendant. He further testified that he did not intimidate, force or threaten defendant into making the statement. Demma stated that defendant first indicated that he did not remember much and that because the people were dead when he woke, he must have killed them. Defendant also said that he noticed that Reeves was not at home and knew that because Reeves would connect him to the deaths, he would have to kill Reeves. Demma testified that after *852 defendant was confronted with information showing that he was lying, defendant said that he could visualize himself strike and kill Gail Coulon. He refused to say anything about Joey or Donovan. Demma asked defendant if he were willing to give a recorded statement, and defendant agreed. Demma stated that as they were setting up the recording equipment, he learned about defendant's statements to David Smith. The statement taken from defendant was videotaped, and the videotape was played for the jury. He denied prodding defendant with information taken from the statement given by Smith to Detective Ronquillo.
In the confession defendant stated that he "flew off the handle." He further stated that he had never gotten along with Gail Coulon and that she made fun of him and stole from him. He remembered her looking up at him and said that he hit her with his hands. He also stated that he "sliced" the victims and poked them with a frog gig to make sure they were dead. He could not remember doing anything to Donovan (referred to as J. D.) or to Joey; but, he recalled cutting Donovan's throat because he heard sounds coming from Donovan. He recalled Reeves walking in and asking him where Gail and Joey where. He also recalled Reeves asking why a table was on its side; and when Reeves went over to investigate after defendant said that there was a mouse in there, defendant hit Reeves on the head with a piece of marble. He dragged Reeves' body into Gail's room and put the body beside the bed. He said that Donovan's body was in the back on the mattress and that Joey's body was by the washing machine. He also admitted writing and cashing checks and staying in motels on the Westbank. Defendant stated that when he ran out of money he met with his "kids" by the river. He said that he met David Smith and the others when he worked as a security guard at the Drop-in Center. He admitted that he told Smith what had happened.
Reverend Stan Helton testified that defendant worked for him at the Church of Christ and that defendant said he had a drinking problem. He helped get defendant into Bridge House where defendant stayed until August 8, 1997 and that he advised against defendant moving in with Reeves and Ms. Coulon.
Sarah Smith also testified about defendant's working at the church starting in January 1997 and said that he worked with the children and painted around the church.

DISCUSSION

ERRORS PATENT
A review of the record shows no errors patent.

ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, defendant complains that the trial court erred in denying him his fundamental right to present a defense. He argues that he should have been allowed to present the testimony of Dr. Sarah Deland and Dr. Marc Zimmerman that he suffered from blackouts caused by substance abuse in order to challenge the probative value of his confession. He asserts that he intended to use this evidence to show that he was being truthful when he initially told the police that he did not recall committing the murders of Gail Coulon, Joey Whitehead, and Joseph Donovan and that the facts he related in his confession had been supplied to him by Marco Demma prior to and during the taping of the confession.
Defendant filed a motion to suppress the confession which the trial court granted on the grounds that defendant had invoked his right to counsel. This court reversed that ruling, and the Supreme Court denied writs. State v. Whitton, 98-1587 (La.App. 4 Cir. 8/12/98), unpub., writ denied 98-2413 (La.11/11/98), 728 So.2d 871. Prior to trial, defendant filed a motion in limine seeking to introduce certain medical evidence without the plea of not guilty by reason of insanity. The trial court denied *853 the motion, stating in a written judgment as follows:
The Defendant's ex parte motion in limine to allow the introduction of certain medical evidence without the plea of not guilty by reason of insanity is hereby denied. There is no evidence to suggest the statement given to the arresting officers by the defendant is inherently unreliable. The defense is attempting to circumvent the real issue, namely, the admissibility of defendant's statement which was previously reviewed by the court. In fact, in a ruling by the Fourth Circuit, State v. Douglas Whitton, (writ 98-K-1587), to determine the admissibility of defendant's statement the court stated that "their review of the videotaped interrogation indicated that defendant's statements were clear and unambiguous." A decision this court cannot disturb.
The court considered La. C.Cr.P. art 703[sic], which establishes, that in order to preserve defendant's constitutional rights, "the State bears the burden of proving that defendant's mental defect or diminished mental capacity did not preclude defendant from giving a voluntary and knowing confession, which this court is convinced does not exist in the present case.
Defendant's emergency writ application (99-K-0437) to this court was denied. Defendant filed a writ application (99-K0501) with the Supreme Court; and, this writ application was denied with three justices dissenting. Two of the dissenting justices stated that they would grant the writ application and issue an order allowing defendant to present psychiatric evidence of any substance induced memory blackout at the time of his interrogation and confession in accordance with La. C.Cr.P. art. 703, subject to a limiting instruction to the jury that it was not to consider this evidence as having any bearing on defendant's mental capacity at the time of the offense.
The denial by this Court and the Supreme Court of defendant's emergency writ application on this issue does not preclude review of the issue in this appeal. A denial of supervisory review is merely a decision not to exercise the extraordinary powers of supervisory jurisdiction and does not bar consideration of the merits of the issue in which supervisory review has been denied when an appeal is taken from the final judgment. State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162; State v. Fontenot, 550 So.2d 179 (La.1989).
La. C.Cr.P. art. 651 provides that when the defendant is tried upon a plea of "not guilty," evidence of insanity or mental defect at the time of the offense shall not be admissible. La. C.Cr.P. art. 703(G) provides:
When a ruling on a motion to suppress a confession or statement is adverse to the defendant, the state shall be required, prior to presenting the confession or statement to the jury, to introduce evidence concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement.
A ruling made adversely to the defendant prior to trial upon a motion to suppress a confession or statement does not prevent the defendant from introducing evidence during the trial concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement.
Defendant cites State v. Van Winkle, 94-0947 (La.6/30/95), 658 So.2d 198, in support of his argument that the trial court erred in refusing to allow him to present medical testimony in order to challenge the reliability of his confession. In Van Winkle, the defendant was convicted for the murder of her son; and, at trial she sought to introduce evidence of, among other things, her mental state when she *854 gave various statements to the police. The Supreme Court, quoting Article 703(G), stated that if the statements were used, the defendant was entitled to introduce "evidence concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given to the confession or statement." Id. at p. 8, 658 So.2d at 203.
Although Article 651 excludes evidence of insanity or a mental defect in the absence of a plea of not guilty by reason of insanity, it appears that under Article 703 and Van Winkle some evidence of mental defect may be admissible when it concerns the circumstances surrounding the making of a confession in order to enable the jury to determine the weight to be given the confession. Hence, it appears that the trial court erred in denying defendant's motion.
In order for an error to be harmless, it must be shown beyond a reasonable doubt that the complained-of error did not contribute to the verdict. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). As a trial error, as opposed to a structural error, it may be quantitatively assessed in the context of the other evidence presented. Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). The inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in the trial was surely be unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
The State points out that defendant did not proffer any of the psychiatric testimony unlike the defendant in Van Winkle.[3] However, the record has been supplemented with the testimony of Dr. Sarah Deland, one of defendant's proposed witnesses regarding the reliability of the confession, who testified on defendant's behalf during the penalty phase of the trial. She diagnosed him as suffering from substance induced persisting amnestic disorder which meant that there would be periods where he would not remember even when he was not acutely intoxicated. During cross-examination by the State, Dr. Deland read an excerpt from defendant's confession about the killing of Owen Reeves. She described his statement as a memory of an incident with some holes in it. On redirect, she was asked the following:
Q. Now the prosecutor wanted you to read this statement or parts of this statement and you read just a few parts of it, correct?
A. Yes.
Q. Do you know whether or not before giving this statement he spent two hours, three hours, or six hours with the police rehearsing answers? Do you know that?
A. No, I don't know that.
Q. Can you say for a fact that these were answers he definitely gave with no coaching or no advice or not being shown evidence or anything? Can you say that?
A. No, I don't know anything else about the statement except the statement.
Q. Do you know what possibly could have precipitated the giving of this statement?
A. I would have no idea.
Assuming that Dr. Deland's testimony would have been the same during the guilt phase of the trial, it appears that the exclusion of her testimony was harmless error because her testimony shows that she knew nothing with regard to the giving of the statement or its reliability. It must be noted that there is nothing in the record as to what the other proposed *855 medical witness, Dr. Marc Zimmerman, would have concluded with regard to defendant's mental state and the reliability of the confession, although the minute entry from the penalty phase indicates that he testified. But it also appears that the exclusion of his testimony would be harmless when examined in context of the other evidence presented at trial. Prior to his arrest, defendant admitted his guilt to David Smith; and that statement to Smith was very similar to his later confession to the police. Therefore, the exclusion of the medical testimony concerning defendant's blackouts as affecting the reliability of the confession was harmless error. This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, defendant complains that the trial court erred in denying his request to admonish the jury regarding the State's blatant misrepresentations of important evidence during closing rebuttal argument.
Defendant objected when the prosecutor made the following argument:
And you canthe Defense may want you to believe that there was someone else running around October the 10th, 1:15 a.m. in the morning registering under the name of Douglas Whitton from Texas. It was this gentleman. It was this man right here, Douglas Whitton. And that's the crucial moment, isn't it? That's the crucial moment when Douglas Whitton had just been asked to leave this family's home for whatever reason and check into the Sweet's Inn. At that moment, at 1:15 a.m. in the morning, that's when he makes the decision.
Defendant's immediate objection was overruled; and, at the conclusion of closing arguments, defendant moved for a mistrial on the grounds that the State intentionally, purposefully, and maliciously misrepresented to the jury that defendant was at Sweet's Inn on Friday night and Saturday morning because it fit the theory that defendant had been excluded from the house. Defendant pointed that 1:15 a.m. would have been in the predawn hours of Friday as opposed to the predawn hours of Saturday. Defendant also moved for an instruction to the jury that 1:15 a.m. on October 10 was in the predawn hours of Friday, not Saturday. The trial court denied the motion.
La. C.Cr.P. art. 774 provides:
The argument shall be confined to the evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state's rebuttal shall be confined to answering the argument of the defendant.
In State v. Langley, 95-1489, p. 7 (La.4/14/98), 711 So.2d 651, 659, the Supreme Court stated:
In any event, prosecutors are allowed broad latitude in choosing closing argument tactics. See, e.g. State v. Martin, 539 So.2d 1235, 1240 (La.1989). Although under La. C.Cr.P. art. 774 closing argument must be "confined to the record evidence and the inferences which can reasonably drawn therefrom," both sides may still draw their own conclusions from the evidence and convey such view to the jury. State v. Moore, 432 So.2d 209, 221 (La.1983), cert. denied 464 U.S. 986, 104 S.Ct. 435, 78 L.Ed.2d 367 (1983). "Before allegedly prejudicial argument requires reversal, the court must be thoroughly convinced that the jury was influenced by the remarks and that such contributed to the verdict." State v. Taylor, 93-2201, p. 21 (La.2/28/96), 669 So.2d 364, 375; State v. Jarman, 445 So.2d 1184, 1188 (La.1984). We also ask whether the remarks injected "passion, prejudice or any arbitrary factor" into the jury's recommendation. Moore, 432 So.2d at 220.
Defendant is complaining only about the trial court's refusal to give the requested *856 admonishment or instruction and is not complaining about the denial of his motion for a mistrial. In that requested admonishment/instruction, defendant wanted the trial court to instruct the jury that 1:15 a.m. on October 10 was a Friday morning and not a Saturday morning. This requested admonishment/instruction would have amounted to a factual finding by the court, and as such it is prohibited by La. C.Cr.P. art. 772 which provides:
The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted.
Moreover, it does not appear that the State's erroneous statement that 1:15 a.m. on October 10 was a Saturday morning rather than a Friday morning influenced the jury and contributed to the verdict considering all of the other evidence of defendant's guilt, especially his confession. This assignment of error is without merit.
Accordingly, for the reasons expressed above the convictions and sentences of defendant Douglas Whitton are hereby affirmed.
CONVICTIONS AND SENTENCES AFFIRMED.
NOTES
[1] Trial had been set previously on November 16, 1998; but, a mistrial was declared when a potential juror watched a television news program that had a report about the trial.
[2] On cross-examination, he stated that they stopped playing at 8:00.
[3] There is no reference to the proffered testimony in the Supreme Court's opinion, but the opinion from the Fifth Circuit details the proffered psychiatric testimony. State v. Van Winkle, 93-843 (La.App. 5 Cir. 3/16/94), 635 So.2d 1177.