ROSEMARY LEDET, Judge.
|, This is a criminal appeal. The defendant, Jabari Williams, appeals his conviction and sentence for second degree murder. Finding no reversible error, we affirm. We also deny the Motion to Designate Attached Exhibits as Part of the Record on Appeal filed by Mr. Williams.

STATEMENT OF THE CASE

On August 11, 2011, the State indicted Mr. Williams for second degree murder of Selvin Gonzales. On August 18, 2011, Mr. Williams pled not guilty.
On January 26, 2012, the trial court denied Mr. Williams’ motions to suppress the evidence and identification.
On May 22, 2012, Mr. Williams filed a motion for a competency hearing. Following the May 31, 2012 hearing, Mr. Williams was found competent to stand trial.[1] Both this court[2] and the Louisiana Supreme Court[3] denied Mr. Williams’ writ applications seeking review of that ruling.
|aOn June 15, 2012, Mr. Williams filed a motion to continue trial on the ground that a material witness he intended to call was unavailable for trial. The trial court denied the motion. On June 18, 2012, Mr. Williams again moved for a continuance of trial or for permission to call his expert witness out of order and prior to the State’s case. The trial court denied the motion[4] and began the trial. Following the three-day trial, the jury found Mr. Williams guilty as charged.
On September 27, 2012, Mr. Williams filed a motion for post-verdict judgment of acquittal, new trial, or both. On September 28, 2012, he filed other post-trial motions. The trial court denied all of his post-trial motions, with the exception of the motion for appeal, and sentenced him to life imprisonment without benefit of parole, probation, or suspension of sentence. This timely appeal followed.

STATEMENT OF THE FACTS

In the early morning hours of April 10, 2011, Selvin Gonzales, a Honduran national, who lived in New Orleans for about five years, was shot and killed near his home in the 600 block ■ of South Salcedo Street.
Jorge Rodriguez, Mr. Gonzales’ housemate, testified that shortly before the shooting, Mr. Gonzales and their other housemate, Carlos Sabillion, left their residence on foot to purchase soda and beer from a neighborhood gas station. About twenty minutes later, Mr. Rodriguez heard gun shots. He stepped outside and saw by Mr. Sabillion, who told him Mr. Gonzales had been shot. Mr. Rodriguez found the victim lying in the street. He called 911, mistakenly reporting the incident as a drive-by shooting. Mr. Rodriguez identified his voice on the [^recording of that call, and he explained that he had assumed the shooting was a drive-by because his neighborhood had many such occurrences. By the time the police arrived, the victim was dead.
Mr. Sabillion, with the assistance of an interpreter, testified that he and the victim *839 had been Mends for about two years before the victim’s death. He, the victim, and Jorge Rodriguez were housemates on Baudin Street at the time of the shooting. He testified that at approximately 2:00 a.m. on the day of the shooting, he and the victim walked to the gas station on the corner of Tulane Avenue and Jefferson Davis Parkway. While he and the victim were paying for their purchases at the outside window of the gas station, Mr. Williams, who was wearing blue jeans and a white shirt, and another black male, approached the victim. Mr. Williams solicited a drug purchase by the victim. The victim handed Mr. Williams money in exchange for drugs. Mr. Sabillion cautioned the victim not to flash his money on the street. He also advised the victim to return the drugs and get his money back, which the victim did.
Mr. Sabillion and the victim then walked from the gas station in the direction of D’Hemeeourt Street, and Mr. Williams and the other black male walked in the opposite direction. However, when Mr. Sabil-lion and the victim turned toward South Salcedo Street, the victim observed Mr. Williams and the other black male following them. When Mr. Sabillion turned to look, Mr. Williams was very close to them; and he was armed with a gun. As Mr. Williams pointed his gun at the victim’s forehead, Mr. Sabillion heard the victim plead for his life and tell Mr. Williams to take his money instead. Mr. Sabillion ran to their residence, and as he did so, he heard gunshots. He told Mr. Rodriguez about the shooting, and Mr. Rodriguez called the police. Mr. Rodriguez and Mr. Sabillion Rfound the victim lying in the street, still alive. By the time the ambulance arrived, the victim was dead.
New Orleans Police Department (“NOPD”) Detective Andrew Packer testified that he was the lead homicide investigator on this case. He and Detective Jeffrey Vappie responded to the scene of the homicide within about ten minutes of the 911 call. The area had already been roped off by the responding officers, and the crime lab technicians had already photographed the scene and collected evidence, including seven .380 caliber and nine millimeter bullet casings. Detective Packer noted that the victim was lying in the street suffering from what appeared to be gunshot wounds to his hand and chest. Pursuant to his conversation with Mr. Rodriguez on the night of the shooting, Detective Packer retrieved the surveillance video from the gas station located on the corner of Tulane Avenue and Jefferson Davis Parkway. The video, dated April 10, 2011 and timed 3:00 a.m., shows the victim speaking with Mr. Williams and then the two engaged in what appeared to be an argument.
On April 13, 2011, Detective Packer spoke to Mr. Sabillion at his residence. Mr. Rodriguez translated their conversation. Detective Packer showed Mr. Sabil-lion the gas station surveillance video in which he identified himself and the victim. He also pointed out Mr. Williams as the shooter. In a subsequent interview with Mr. Sabillion, which was translated by a bi-lingual NOPD officer, Detective Packer showed Mr. Sabillion a freeze frame photo of Mr. Williams in the gas station video. From that photo, Mr. Sabillion identified Mr. Williams as the shooter.[5]
Ron cross-examination, Mr. Sabillion testified that he had been robbed in the past and that on each occasion the perpe *840 trator was a black male. Although he stated he finds it “difficult to distinguish” one black person from another, he stated that he was certain of his identification of Mr. Williams as the shooter because he was so close to him at the time the shooting occurred. He admitted that he was in this country illegally. He testified that the police said they would help him if he helped catch the shooter.[6] He told the police he was not assisting them for the purpose of immigration papers but rather to catch his friend’s killer.
Detective Packer released a portion of the gas station video to the news media on April 19, 2011, for help in identifying the then-unknown perpetrator. Detective Packer testified that at approximately 1:00 а.m. on April 20, 2011, Mr. Williams voluntarily came to police headquarters. Detectives Packer and Vappie escorted Mr. Williams to an interview room and offered him food, drink and use of the bathroom, all of which he declined. Shortly thereafter, Detective Packer began videotaping the discussions he and Detective Vappie had with Mr. Williams.[7]
Initially, Mr. Williams told Detectives Packer and Vappie that he had seen himself on television, and that he wanted to set the record straight by denying that he shot the victim. Detective Packer told Mr. Williams, though untrue, that the police had a video of him shooting the victim. Mr. Williams admitted that he was | f,carrying a .380 caliber weapon the night of the murder.[8] Eventually, Mr. Williams admitted that he killed the victim, but he claimed the shooting was in self-defense. At the conclusion of Mr. Williams’ statement, Detective Packer secured a warrant for Mr. Williams’ arrest and escorted him to Orleans Parish Prison.
Detective Packer informed the court that a search warrant executed at Mr. Williams’ residence on South Scott Street did not produce any evidence. Detective Packer also noted that the police were never able to identify the second black male depicted in the gas station surveillance video. Detective Packer determined that the victim was unarmed at the time of the shooting and his money was missing.
Detective Vappie, a fifteen-year NOPD veteran, testified that he assisted Detective Packer at the homicide scene in this case. Pursuant to Detective Packer’s direction, he viewed the gas station surveillance tape. He recognized the victim in the tape by his clothing. He notified Detective Packer, who relocated to the gas station and viewed the video. Detective Vappie testified that on April 20, 2011, he was at police headquarters when Mr. Williams came in to give a statement to Detective Packer. He sat in on the pre-interview and the main interview and participated in asking questions. That was his last involvement with the case.
Detective Vappie testified that he was instructed in the Reid Interrogation Technique and trained by the Department of *841 Justice in interview and interrogation procedures. As part of that training, the detective acknowledged that it is an acceptable tactic to tell either falsehoods or half-truths to a possible perpetrator.
Dr. Richard Tracy, who was stipulated to be an expert in the field of forensic pathology, testified that he conducted the autopsy on the victim’s body on April |710, 2011. He opined that the victim suffered two fatal wounds to the front torso, which severed the spine causing instant paralysis and death by loss of blood. Examination of the bullet wounds indicated that they were fired from a distance of eighteen or twenty inches from the skin. He also noted that the victim’s blood alcohol content was .188 at the time he died.

ERRORS PATENT

A review for errors patent on the face of the record reveals one. The trial court sentenced Mr. Williams immediately after denying his motions in arrest of judgment and for new trial. Under La. C.Cr.P. art. 873, if a motion for new trial or motion in arrest of judgment is filed, a sentence shall not be imposed until at least twenty-four hours after the motion is denied, unless the defendant expressly waives the delay or pleads guilty. It is well-settled that a defendant may implicitly waive the twenty-four hour delay. See State v. Pierre, 99-3156, p. 7 (La.App. 4 Cir. 7/25/01), 792 So.2d 899, 903 (implicit waiver where defense counsel responds in the affirmative when trial court inquires if he is ready for sentencing). In State v. Robichaux, 00-1234, p. 7 (La.App. 4 Cir. 3/14/01), 788 So.2d 458, 464-65, at the beginning of the sentencing hearing, defense counsel noted: “Judge, prior to the sentencing, I would like to put on the record an oral motion for a new trial ...” This court held that “by virtue of the defense counsel’s statement, defendant announced his readiness for sentencing, which implicitly waived the waiting period.” Id., 00-1234 at p. 7,788 So.2d at 465.
In this case, before sentencing, Mr. Williams’ counsel announced to the court: “Judge, I’ve filed today into the record and served on the State, two motions prior to sentencing....” As in Robichaux, by virtue of defense counsel’s statement announcing Mr. Williams’ readiness for sentencing, he implicitly waived the | ¿waiting period. Moreover, the sentence imposed was mandatory; and Mr. Williams has not shown any prejudice by the failure to observe the delay.

ASSIGNMENT OF ERROR NUMBER I

In his first of eleven assignments of error, Mr. Williams argues that the trial court committed reversible error by forcing him to stand trial even though he was incompetent to do so.
“Mental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense.” La.C.Cr.P. art. 641.
In State v. Bennett, 345 So.2d 1129, 1138 (La.1977), the Louisiana Supreme Court held that the appropriate considerations for determining whether the accused is fully aware of the nature of the proceedings include the following:
[Wjhether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction.
*842 Additionally, in determining an accused’s ability to assist in his defense, consideration should include:
[W]hether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial.
Bennett, 345 So.2d at 1138 (citations omitted).
19Given the presumption of sanity in Louisiana jurisprudence, a defendant has the burden to establish his incapacity to stand trial by a preponderance of the evidence. La. R.S. 15:432. A reviewing court owes the trial court’s determination as to the defendant’s competency great weight, and the trial court’s ruling thereon will not be disturbed on appeal absent a clear abuse of discretion. State v. Bridgewater, 00-1529, p. 14 (La.1/15/02), 823 So.2d 877, 892.
During the May 31, 2012 competency hearing, the trial court heard testimony from the State’s experts, Dr. Raphael Sal-cedo and Dr. Richard Richoux. Both experts testified that Mr. Williams had neither a reported history of mental illness nor showed any signs of a major psychiatric illness. The physicians stated that Mr. Williams did not present as an individual with substantial intellectual limitations, and they opined his I.Q. was in the borderline range, i.e., seventy to seventy-nine.[9] He displayed an understanding of the legal system; why and what he was charged with; had no memory problems; was clearly capable of making simple decisions in response to well-explained alternatives; and was capable of assisting his attorney with trial preparation and testifying on his own behalf. Dr. Salcedo, however, noted that: “The court may need to be aware that he does seem to have some cognitive limitations but not within the low 60’s I.Q. — not enough as to impair his ability to meet the [State v.] Bennett [345 So.2d 1129 (La.1977) ] criteria.... and we recommend that he be found competent to proceed.”
During the hearing, Dr. Salcedo also noted that the defense’s expert, Dr. Jill Hayes (who was not called to testify but whose report had been submitted into evidence), found that Mr. Williams was mildly retarded based on an I.Q. test score |inof 63. Dr. Salcedo also noted that Dr. Hayes “kind of hedge[d]” in her report concerning malingering, and he quoted from her report: “My clinical impression and validity indicate or suggest that he [Mr. Williams] extended good effort during the current evaluation. However, I will reserve an opinion to malingering, level of effort, until additional data is received or generated.” Dr. Salcedo verbalized his opinion on this portion of Dr. Hayes’ report:
I think what she is talking about there is that if you have an I.Q. of 63, you would be flagged by the school system. You know, there would be special education records, which he denied ever being in special education. With 63 *843 [I.Q.], you probably would be getting a Social Security disability check. So you would be flagged by the Social Security administration, and I think that’s what she was alluding to. I mean, I’m not trying to speak for her, but that’s the protocol.
The trial judge evaluated the conflicting findings of the defense expert, Dr. Hayes, and the court-appointed psychiatrists, Dr. Salcedo and Dr. Richoux. Based upon the evidence, we find that the trial court did not abuse its discretion by determining that Mr. Williams understood the proceedings, could assist in his defense, and that he was competent to proceed to trial. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER II

Mr. Williams argues that the trial court erred when it granted the State’s motion in limine seeking to prevent him from introducing any evidence of his mental retardation. He maintains he should have been allowed to introduce the evidence as part of the circumstances surrounding his confession.
In granting the State’s motion, the trial court stated the following: “[it was] a back door way of trying to get in a mental disease or defective disorder or diminished capacity or a different way of trying to back door in about his ability to |nwaive his rights as to the statement. And, again, I think that if you were going to produce any of those, you would have had to enter ... a plea of not guilty; not guilty by reason so insanity.”
Mr. Williams maintains that his mental retardation made him susceptible to manipulation, which in turn casts doubt on the reliability of his confession. Further, he argues that the jury should have been allowed to consider the evidence “to determine the weight and probative value of the statement.”
Under La.C.Cr.P. art. 651, in pertinent part, provides that when a defendant is tried upon a plea of “not guilty,” evidence of insanity or mental defect at the time of the offense shall not be admissible. Under La. R.S. 14:14, the Louisiana codification of the McNaughten rule,[10] an offender is exempt from criminal responsibility only if he is incapable of distinguishing between right and wrong with reference to the conduct in question. As a result, evidence of a mental defect which does not meet the McNaughten definition of insanity cannot negate a specific intent to commit a crime and reduce the degree of the offense. See State v. Deboue, 552 So.2d 355, 366 (La.1989) (while not claiming insanity at time of commission of the murders, defendant argued in vain that mental retardation rendered him incapable of forming specific intent for aggravated burglary of the murder victims’ home).
Notwithstanding La.C.Cr.P. art. 651, the Louisiana Supreme Court has recognized a defendant’s constitutional right to present a defense. See State v. Whitton, 99-1953, p. 17 (La.App. 4 Cir. 9/27/00), 770 So.2d 844, 854 (citing State v. Van Winkle, 94-0947 (La.6/30/95), 658 So.2d 198). In Whitton, this Court found 112the trial court erred when it excluded evidence that the defendant suffered from blackouts caused by substance abuse to challenge the volun-tariness of his confession. Id., 99-1953 at p. 14-17, 770 So.2d at 852-54. The defendant maintained he had been truthful when he initially told police that he did not recall committing the multiple murders and had later been supplied with the facts that he related in his confession to police both before and during his recorded statement. Id., 99-1953 at p. 14-15, 770 *844 So.2d at 852. The Whitton court held that “some evidence of mental defect may be admissible when it concerns the circumstances surrounding the making of a confession in order to enable the jury to determine the weight to be given the confession.” Id., 99-1953 at p. 17, 770 So.2d at 854 (citing La.C.Cr.P. art. 703(G)[11] and Van Winkle, 94-0947 at p. 8, 658 So.2d at 203 (suggesting the trial court erred when excluding evidence of defendant’s mental state during her various inculpatory statements)).[12]
1 ^Accordingly, there exists jurisprudential support for Mr. Williams’ claim that he should have been allowed to introduce evidence concerning mental retardation for the limited purpose of determining the weight to be accorded his statement. Nonetheless, the erroneous exclusion of this evidence is subject to the harmless error standard of review. State v. Holmes, 06-2988, p. 48 (La.12/2/08), 5 So.3d 42, 76. An error is harmless if it can be said beyond a reasonable doubt that the guilty verdict rendered in the case was surely unattributable to that error. State v. Barbour, 09-1258, p. 14 (La.App. 4 Cir. 3/24/10), 35 So.3d 1142, 1150.
The videotaped confession does not show any signs of Mr. Williams’ claim of mental retardation.[13] His .responses to Detective Packer are measured, cautious and precise. There is no indication he was confused during the statement, or that his responses were offered to please Detective Packer. In fact, in the beginning of the statement, he denies killing the victim. Then, as the statement continues, he admits that he shot the victim but quickly added that the shooting was in self-defense. Additionally, he challenges Detective Packer, that if, as the detective said, the police had video of the defendant shooting the victim, why was there no video of the defendant robbing the victim.
Before any questioning by Detective Packer, Mr. Williams admitted he voluntarily appeared at police headquarters after seeing himself on the gas station surveillance video aired by the media and that he wanted to proclaim his innocence. Later in the interview, he said he used “a *845 thirty-eight or three eighty” to shoot the victim. Mr. Williams’ claim of mental retardation is thus questionable.
114Regardless, considering all of the evidence, the jury’s unanimous verdict was unattributable to the exclusion of the defense expert’s expected testimony regarding Mr. Williams’ alleged subnormal I.Q., and thus was harmless error.

ASSIGNMENT OF ERROR NUMBER III

Mr. Williams argues the trial court erred in denying his motion to suppress his statement to the police. In support, he argues that he was not advised of his Miranda rights; he was restrained during the interrogation; and the statement was not voluntary, but rather constructed by Detectives Packer and Vappie.
This court has discussed the requirements for admitting into evidence an incul-patory statement, as follows:
Before the state may introduce an inculpatory statement or confession into evidence, it must affirmatively show that the statement was free and voluntary and not the result of fear, duress, intimidation, menace, threats, inducements, or promises. La. R.S. 15:451; La.C.Cr.P. art. 703(D); State v. Gradley, 97-0641 (La.5/19/98), 745 So.2d 1160, 1166. The State must prove that the accused was advised of his Miranda rights and voluntarily waived these rights in order to establish the admissibility of a statement made during custodial interrogation. State v. Green, 94-0887, pp. 9-10 (La.5/22/95), 655 So.2d 272, 280; State v. Labostrie, 96-2003, p. 5 (La.App. 4 Cir. 11/19/97), 702 So.2d 1194, 1197. A court must look to the totality of the circumstances surrounding the confession to determine its voluntariness. State v. Lavalais, 95-0320, p. 6 (La.11/25/96), 685 So.2d 1048, 1053. The testimony of police officers alone can be sufficient to prove the defendant’s statements were freely and voluntarily given. State v. Jones, 91-2217, p. 11 (La.App. 4 Cir. 2/24/99), 731 So.2d 389, 396.
State v. Butler, 04-0880, p. 4 (La.App. 4 Cir. 1/12/05), 894 So.2d 415, 418.
Whether a statement was voluntary is a fact question. Thus, the trial court’s ruling, based on conclusions of credibility and the weight of the testimony, is entitled to great deference and will not be disturbed on appeal unless there is no 115evidence to support it. State v. Byes, 97-1876, pp. 11-12 (La.App. 4 Cir. 4/21/99), 735 So.2d 758, 765.
Mr. Williams’ claim that he was not advised of his Miranda rights is without merit. Detective Packer testified both at the suppression hearing and at trial that he advised him of his Miranda rights at least twice before his statement and that Mr. Williams indicated he understood his rights. After being advised, Mr. Williams signed a waiver of rights form. Detective Packer also noted, and Mr. Williams agreed, that Mr. Williams appeared at police headquarters voluntarily, stating that he wanted to give a statement. Moreover, Detective Packer advised Mr. Williams that he was not under arrest, and that he was free to leave the unlocked interview room at any time. The videotaped confession also confirms that Mr. Williams was advised of, understood, and waived his rights, and his statement was given of his own free will. Mr. Williams denied being coerced or offered any promises in return. The video shows that he was not restrained in any manner.
Where conflicting testimony is offered, credibility determinations lie within the sound discretion of the trial court, and his ruling will not be disturbed unless clearly contrary to the evidence. State v. Gradley, 97-0641, pp. 9-10 (La.5/19/98), *846 745 So.2d 1160, 1166 (citing State v. Vessel, 450 So.2d 938, 943 (La.1984)). The trial court found Detective Packer’s testimony credible. Given the testimony adduced at the suppression hearing and at trial, there is no indication that the court abused its discretion in its credibility finding. See State v. Carter, 99-2234, p. 18 (La.App. 4 Cir. 1/24/01), 779 So.2d 125, 138 (when reviewing a trial court’s ruling on a motion to suppress, an appellate court is not limited to evidence adduced at the hearing on the motion to suppress; it may also consider evidence given at trial.)
11fiEven assuming the trial court erred in denying Mr. Williams’ motion to suppress his statement, the erroneous admission of a statement or confession is subject to a harmless error analysis. State v. LeBlanc, 10-1484, p. 29 (La.App. 4 Cir. 9/30/11), 76 So.3d 572, 590. Mr. Sabillion unequivocally identified Mr. Williams at trial as the shooter. Mr. Sabillion said he could never forget the face of the man who killed his friend. Thus, the verdict was unattributable to Mr. Williams’ confession. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER TV

Mr. Williams argues that the trial court erred in denying his motion to suppress the identification on the grounds that it was unconstitutionally suggestive.
The law regarding suppression of out-of-court identifications is well-settled:
To suppress an identification, a defendant must first prove that the identification procedure was suggestive. State v. Prudholm, 446 So.2d 729, 738 (La.1984). An identification procedure is suggestive if, during the procedure, the witness’ attention is unduly focused on the defendant. State v. Robinson, 386 So.2d 1374, 1377 (La.1980). Moreover, a defendant who seeks to suppress an identification must prove both that the identification itself was suggestive and that a likelihood of misidentification existed.as a result of the identification procedure. State v. Valentine, 570 So.2d 533 (La.App. 4 Cir.1990).
The Supreme Court has held that even if the identification could be considered suggestive, it is the likelihood of misidentification that violates due process, not merely the suggestive identification procedure. State v. Thibodeaux, 98-1673 (La.9/8/99); 750 So.2d 916, 932. Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). Even a suggestive, out-of-court identification will be admissible if it is found reliable under the totality of circumstances. State v. Guy, 95-0899 (La.App. 4 Cir. 1/31/96), 669 So.2d 517. If a suggestive identification procedure has been proved, a reviewing court must look to several factors to determine, from the totality of the circumstances, whether the suggestive identification presents a substantial likelihood of mis-identification at trial. State v. Martin, 595 So.2d 592, 595 (La.1992). The U.S. Supreme Court has set forth a five-factor test to determine whether a suggestive identification is reliable: (1) the | ^opportunity of the witness to view the assailant at the time of the crime; (2) the witness’s degree of attention; (3) the accuracy of the witness’s prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. Manson v. Brathwaite, Id. The corrupting effect of *847 the suggestive identification itself must be weighed against these factors. Martin, 595 So.2d at 595.
State v. Holmes, 05-1248, p. 6 (La.App. 4 Cir. 5/10/06), 931 So.2d 1157, 1161. Further, the trial court’s determination on the admissibility of identification evidence is entitled to great weight and will not be disturbed on appeal in the absence of an abuse of discretion. Holmes, 05-1248 at p. 7, 931 So.2d at 1161.
Mr. Williams complains that rather than displaying a six-member photo lineup to Mr. Sabillion at police headquarters, Detective Packer, at Mr. Sabillion’s home, showed him a freeze frame photo from the gas station video of the suspected perpetrator, from which he identified Mr. Williams as the killer.
At the January 26, 2012 suppression hearing, Detective Packer testified that he interviewed Mr. Sabillion, the eyewitness, twice after the shooting. In the first interview, three days after the shooting, he described the shooter as a black male wearing a black T-shirt and blue jean pants, who approached him and the victim at the gas station. Mr. Sabillion stated he had a good look at his face while at the gas station because the area was well lighted. At that time, Detective Packer showed Mr. Sabillion the gas station video, from which Mr. Sabillion identified himself, the victim and the shooter. Detective Packer testified that Mr. Sabillion did not display any hesitancy in identifying the black male in the video as the shooter.
During the second interview, Detective Packer provided Mr. Sabillion a freeze frame photo from the gas station video of the person Mr. Sabillion identified as the shooter. Mr. Sabillion confirmed that the photo was a picture of the shooter. Mr. Sabillion said he looked at the shooter as the shooter ran toward him and the 1 ^victim. Mr. Sabillion ran away only when the shooter was upon them aiming a gun at the victim’s head. At that time, neither Detective Packer nor Mr. Sabillion knew the identity of the shooter. Detective Packer first learned the name of the shooter when Mr. Williams came to police headquarters after the media aired portions of the gas station video.
There are no signs that the video surveillance presented to Mr. Sabillion was suggestive. Detective Packer initially showed Mr. Sabillion the video so that he could identify himself and the victim. On his own account, Mr. Sabillion also identified the shooter in the video. Although showing the freeze frame photo from the footage is more problematic, consideration of the five Manson factors shows that the identification was reliable. Mr. Sabillion testified that he observed the shooter approach the victim at the gas station under good lighting conditions. He also testified that he looked directly at the shooter just before the shooting. Even after Mr. Sabil-lion’s identification, the identity of the shooter was unknown and Detective Packer had no motive for Mr. Sabillion to identify Mr. Williams as the shooter. Further, Mr. Sabillion’s in-court identification of Mr. Williams was unwavering. He positively identified him as the shooter. Moreover, defense counsel subjected Mr. Sabil-lion to thorough cross-examination on his identification of Mr. Williams as the man who shot the victim. Thus, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER V

Mr. Williams argues that he suffered violations of his right to due process pursuant to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when the State suppressed evidence that it had offered Mr. Sabillion immigration assistance in exchange for his cooperation. Mr. Williams also argues 119that the State compounded its error at trial by failing to *848 correct Mr. Sabillion’s false testimony pursuant to Napue v. People of State of Ill., 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), that he was testifying not “for any kind of [immigration] papers,” but instead out of a desire to ensure that the victim’s death would not “be in vain.”
The Brady rule was summarized by this court in State v. Hollins, 11-1435, pp. 23-24 (La.App. 4 Cir. 8/29/13), 123 So.3d 840, 858, as follows:
Due process requires the disclosure of evidence that is both favorable to the accused and material either to guilt or punishment. The Brady rule also requires the disclosure of evidence adversely affecting the credibility of government witnesses. See Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). When such information is not disclosed and it is material in that its suppression undermines the confidence in the outcome of the trial, then constitutional error occurs and the conviction must be reversed. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Id. Materiality hinges on “not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.” Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). Further, the defendant must show that “ ‘disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable.’” State v. Marshall, 81-3115, 94-0461 (La.9/5/95), 660 So.2d 819, 826 (quoting Kyles, 514 U.S. at 441, 115 S.Ct. at 1569).
The Napue case stands for the principle that where a prosecutor allows a state witness to give false testimony without correction, a reviewing court must reverse the conviction if the testimony reasonably could have affected the jury’s verdict, even if the testimony goes only to the credibility of the witness. 360 U.S. at 269-70, 79 S.Ct. at 1177.
|2ftAt trial, Mr. Sabillion testified that about two months after the murder,[14] two representatives from the public defender’s office came to speak to him at his house. Mr. Sabillion believed the individuals were police personnel — “the ones who were defending [the victim].” Under the impression he was speaking to the police, Mr. Sabillion told the two representatives what happened the night of the shooting. The representatives composed a statement for him, and he signed it.[15] The defense investigators returned a second time and “said for us to withdraw the statement; that [the defendant] couldn’t be jailed.”
Mr. Williams claims that Mr. Sabillion indicated to the defense investigators that the police offered to help him obtain a visa in exchange for his testimony against the defendant, and to that end gave him the name and telephone number of an immigration attorney to assist him. At the conclusion of Mr. Sabillion’s cross examination, defense counsel unsuccessfully *849 moved for mistrial arguing that the State committed a Brady violation by withholding exculpatory evidence of the State’s promise to assist Mr. Sabillion in exchange for his testimony.
Under the Brady rule, there is no violation “where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available from another source, because in such cases there is really nothing for the government to disclose.” State v. Hobley, 98-2460, p. 25 n. 10 (La.12/15/99), 752 So.2d 771, 786.
Here, there was no Brady violation. The defense was well aware prior to trial that Mr. Sabillion claimed, and Detective Packer denied, that the State offered 121 him assistance with his immigration status. The defense investigators reported the allegation in the statement they composed and wrote for Mr. Sabillion. Moreover, defense counsel thoroughly explored that issue during its cross-examinations of Mr. Sabillion and Detective Packer in an effort to impeach both witnesses.
Nor was there a Napue violation. During the State’s case in chief, Detective Packer denied making any promises to Mr. Sabillion in exchange for his testimony. Detective Packer’s testimony during cross-examination was also a blanket denial of any offers of assistance. Further, Mr. Sa-billion could not remember who made the offer or when it was made. Most significant, Mr. Sabillion emphatically stated that he testified only because Mr. Williams was the man who killed his friend. He denied doing so out of self-interest. Finally, there is no evidence in the record that Mr. Sabillion actually received any assistance from the State.
Even assuming the facts written by the defense investigator in the statement Mr. Sabillion signed are true, Mr. Williams has not shown any prejudice because he was aware of the information before trial and used it to his best advantage at the trial. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER VI

Mr. Williams argues that the trial court erred in not finding a pattern of racially motivated peremptory challenges when the State utilized eleven of its twelve peremptory challenges to strike African Americans from the jury. Mr. Williams argues a violation of his rights to due process and equal protection.
In Batson v. Kentucky, 476 U.S. 79, 104, 106 S.Ct. 1712, 1727, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that the Equal Protection Clause | ^prohibits the use of peremptory challenges to discriminate on the basis of race.[16] The Supreme Court established a three-step analysis to determine whether a peremptory challenge has been used in violation of the Equal Protection Clause. The district court must first determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis *850 of race. Batson, 476 U.S. at 94-97, 106 S.Ct. at 1722-23. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. This second step “does not demand an explanation that is persuasive or even plausible,” as long as the reason is not inherently discriminatory. Purkett v. Elem, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995). Finally, the court must determine whether the defendant established purposeful discrimination. Batson, 476 U.S. at 98, 106 S.Ct at 1724.
In Snyder v. Louisiana, 552 U.S. 472, 477, 128 S.Ct. 1203, 1208, 170 L.Ed.2d 175 (2008), the Supreme Court reemphasized the district courts’ role under the third step of Batson: to carefully scrutinize the plausibility of the prosecutor’s explanation for a peremptory strike by evaluating the prosecutor’s credibility, assessing “not only whether the prosecutor’s demeanor belies a discriminatory intent, but also whether the juror’s demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor.”
|⅞⅛ this case, at the end of the first panel of voir dire, the State exercised six peremptory challenges as to potential jurors Joseph, Butler, Villavaso, Marshall, Sansom and Davis. The defense made a Batson challenge, noting all foregoing potential jurors were either “black male or female.”
The State responded to the trial court’s request that it supply race-neutral reasons for the record for excusing the jurors:
... [Ms. Joseph] was the foreperson on a burglary that came back not guilty. She also was the person that first began the conversation about coercion, in talking about statements given by defendants. And she also said the testimony and evidence needs to be really strong if she’s depending on an eyewitness.
... Mr. Butler, I believe he was just this month on a criminal trial where he returned, of the four counts, I believe it was three not guilty verdicts. The court — the jury returned three not guilty verdicts. He also, when asked about statements given by defendants, was the first to offer up the possibility that the defendant may have been beaten outside of the interview room prior to confessing.
... Ms. Villavaso was the first one to, I guess, mention cognitive ability. She’s a special-ed teacher. She talked about mental ability of a person with regard to them giving a confession.
Mr. Marshall, judge, when — you know, speaking about confessions — went into a long conversation about someone may be taking the fall for another person and how one person may have a positive background and a person with a negative background would step up and, essentially, take the fall for the person who’s going somewhere with their life
[[Image here]]
... Mr. Sansom — well, first, when talking about the possibility of a life sentence and needing proof beyond a reasonable doubt, as opposed to proof beyond all doubt, I believe Ms. Burton said she wanted a higher level of proof. Mr. Sansom at that time began to nod his head in agreement with — I believe it was Miss Burton.'
He was also on the case with Mr. Butler, where there were four counts and there were three not guilty verdicts on four counts ...
l^Mr. Davis ... he — -well, first of all, there was a point where I thought him and [co-prosecutor] were about to engage in an argument.... And had somewhat bad body language through *851 out after that interaction with [the co-prosecutor]. He went on to kind of talk about confessions ... And if they have a certain mental state and they’re tired and they get drilled mentally, then they would just go ahead and confess to something that they didn’t do.
The trial judge denied the defense’s Bat-son challenges.
Following the second round of voir dire, the State excused jurors West, Carter, Washington, Jackson and Ballard. The defense raised a Batson objection noting that the five jurors excused were African-Americans, which, he maintained, constituted a pattern of racial exclusion. The trial court disagreed, stating:
... I disagree with you.... I mean, the pattern may be that they’re African American; but they have to strike them simply because of that. And what I’m saying to you is I do recognize that as to West, I recall the answer that he gave, Mr. Washington.
... For Miss Ballard I do recall the answers that she gave and Miss Ballard’s body language.[17] But I will ask the State specifically as to Miss Carter — Miss Carter and Miss — Mr. Jackson ... [18]
Prosecutor:
With regards to Miss Carter ... [Defense counsel] was asking for ratings of the New Orleans Police Department. Mr. West responded that he would give ’em a zero and started laughing about it. And Miss Carter was who he was talking to.
She was laughing along with Mr. West, as well. During the actual voir dire of this panel, she appeared disinterested and kind of had a — you know, slouched down in the chair, as if she didn’t want to be asked any questions ....
... Mr. Jackson has a prior arrest
[[Image here]]
1;⅝A neutral explanation for use of peremptory strikes must be clear, reasonably specific, legitimate, and related to the case at bar. Purkett, 514 U.S. at 768-69, 115 S.Ct. at 1771. A neutral explanation is an explanation based on something other than race. Hernandez v. New York, 500 U.S. 352, 374, 111 S.Ct. 1859, 1874, 114 L.Ed.2d 395 (1991). A prospective juror’s inattentiveness and body language have been held to be valid race-neutral reasons for exercising a peremptory challenge. State v. Jacobs, 09-1304, p. 10 (La.4/5/10), 32 So.3d 227, 234. Further, prospective jurors who have potential ill will toward police may be peremptorily challenged. State v. Jones, 42,531, p. 6 (La.App. 2 Cir. 11/7/07), 968 So.2d 1247, 1252.
Here, none of the reasons offered by the State are inherently based on race. Butler was excused because he returned a not guilty verdict in a recent criminal matter. Villavaso and Marshall expressed doubt about a defendant’s cognitive ability, possibly undermining the State’s contention that the defendant voluntarily confessed. Sansom said he would hold the State to a standard of proof higher than beyond a reasonable doubt. Davis, *852 Carter and Jackson displayed bad body language. West and Washington indicated they did not trust the police. Ballard appeared disinterested. The State found Jackson unfit because of his arrest record and stated that he did not engage in conversation with the State or the defense.[19]
A reviewing court owes the trial court’s evaluations of discriminatory intent great deference and should not reverse unless the evaluations are clearly erroneous. |2fiHernandez, 500 U.S. at 364-65, 111 S.Ct. at 1868-69. The trial judge heard and saw the potential jurors and concluded that the State articulated race neutral reasons as to each potential juror excluded. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER VII

Mr. Williams argues reversible error in the trial court’s failure to grant a mistrial after the prosecutor made improper arguments in its rebuttal closing argument. Mr. Williams asserts that the arguments violated his rights to counsel, due process, fair trial, and against self-incrimination. Further, he argues that some of the State’s arguments were prejudicial to the defense in that they amounted to personal attacks on defense counsel, impugned defense counsel’s integrity in the eyes of the jury, or both.
Under La.C.Cr.P. art. 774, the scope of the argument is limited to evidence introduced, the lack of evidence, and conclusions that may be drawn therefrom. It specifically warns that “[t]he argument shall not appeal to prejudice.” Additionally, La.C.Cr.P. art. 775 provides for a mistrial in a jury case when prejudicial conduct has made it impossible for the defendant to obtain a fair trial.
“Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the ... district attorney ... in argument, refers directly or indirectly to ... [t]he failure of the defendant to testify in his own defense[.]” La.C.Cr.P. art. 770(3). “To warrant a mistrial, the inference must be plain that the remark was intended to bring to the jury’s attention the failure of the defendant to testify.” State v. Allen, 03-2418, p. 37 (La.6/29/05), 913 So.2d 788, 812 (citing State v. Stephenson, 412 So.2d 553, 557 (La.1982)).
In closing argument, defense counsel argued that Detective Packer tricked Mr. Williams into making a false confession. Defense counsel further argued that 127the evidence shows that the victim was actually shot during a drive-by shooting, contrary to Mr. Sabillion’s description. Lastly, during both his opening statement and closing argument, defense counsel stated that Mr. Williams knew who committed the murders, but he could not reveal the identity of the true killer(s) because Mr. Williams and his family would be in danger.
The defense lodged eleven contemporaneous objections to the prosecutor’s remarks during its rebuttal closing argument, which were as follows:
... [defense counsel’s] job is to manufacture doubt, ... And so what the de *853 fense attorney has as a benefit is that when the case begins he doesn’t necessarily have to have a defense then.... And as the evidence unfolds, he doesn’t necessarily have to have a defense then. When his defendant goes in and gives a confession, he doesn’t necessarily have to have his story together then. The trial begins. You hear opening statement. He doesn’t necessarily have to lay out a story then. And as everything unfolds, you arrive at the end, at closing arguments. And then that’s when they give you the story that they want you to believe.
[[Image here]]
We took evidence. The investigator went out. He investigated everything. Was compiled into a police report. It’s been the same story, over and over again. You heard [defense counsel] talk to you about a preliminary hearing and then a motions hearing. And every time it was the same evidence, the same evidence, the same testimony. And every time [defense counsel] has tried to find different ways to say this wasn’t right, that wasn’t right.
[[Image here]]
Now we know that was a lie, right. That changes relatively quick. You hear about his second defense. And his second defense essentially turns into what it has to turn into in the moment; which is, yeah; I was out there and yeah I was with ’em. Stuff just went bad. Somebody else shot him. That was the second defense that you heard about. Then there was the third defense. He establishes. Yes, I was out there. Yes, everything went bad. And yes it was me who shot him. Then his lawyers get involved. Now, when his lawyers get involved, they realize now he has confessed to this crime ... Not only did the defendant confess to this crime; but an-
other hurdle that they had to jump was the fact that he had been identified; identified by an eyewitness, the lone eyewitness; who was out there that night ... Now, at that time no name was known, right.
[[Image here]]
So that was the next effort at a defense, right. Then he refused that. So then what do they do? The next best thing. They wrote out a | ^statement for [Carlos Sabillion]. They wrote out a statement for him and got him to put his name on it; a statement that he said he never even read. And I want you to look at something on that statement. I mean, the last time I checked when I was listening to the testimony, the witness said his name was Carlos Sabillion. Now, if you look at this — the bottom is signed — it says Carlos Gonzales.
[[Image here]]
This brilliant narration that you heard from the defense attorney. He put up this big video for you and gave you this whole alternate — this whole alternate universe, this whole alternate world about how everything took place. No evidence; no testimony. He narrated a video.
[[Image here]]
Now, [defense counsel] wants to tell you about lies, lies, lies. But that’s his job. I mean, he’s not going to point out to you inconsistencies.
[[Image here]]
Don’t be mistaken. When there’s a hearing called a motion to suppress hearing, the judge listens to the evidence — the judge listens to the testimony. That statement would not have come to you if it was not admissible.
[[Image here]]
So you gotta ask yourself; why did we spend three hours listening to questions *854 to Detective Vappie about all these portions in the investigation that he wasn’t involved in? It’s a tactic to obscure the truth.
[[Image here]]
Why would the victim in that matter point out a random guy on the video if the guy wasn’t responsible? And at that point nobody knew his name; nobody knew if he was ever going to turn himself in. If they never got any Crimes-topper tips, the investigation would have ended there. So to act as if Detective Packer had something — some axe to grind or just wanted to get this guy and end this case — there’s tons of open homicide cases. That doesn’t even make sense. That story does not fly.
[[Image here]]
And he’s basically creating a video of himself, telling lies over and over and over again. And one lie begets another lie. So we get to the end of that prein-terview. Defense attorney wants to say that we showed you the end of that interview because we wanted you to think less of this young man because he was in there rapping. Now I happen to know the song that he was rapping. So I don’t want you to think less of him, simply because of the lyrics of the song. But I want you to take note of what song he was rapping.
[[Image here]]
So [defense counsel’s] going to have to be like repeating him. He’s going to have to make something up that sounds really, really good and really, really believable. And he made something up. I submit to you it’s not believable. It shouldn’t even be considered. I^Cause he told you — what did he say when he said? He said; it’s not in evidence; but I bet you that he knew the real shooter carried a .38. What? What? How do we — how do we — so is he a witness to this? Was he there? Does he know who did it? Does he not know who did it? I still don’t know that. I still can’t tell. Cause in the opening statement, they made it sound as if he was going to be a witness. They made it sound as if he was on the scene.
Louisiana jurisprudence allows prosecutors wide latitude in choosing closing argument tactics. See, e.g., State v. Martin, 539 So.2d 1235, 1240 (La.1989). Even assuming that remarks are inappropriate, a conviction will not be reversed due to an improper remark during closing argument unless the court is thoroughly convinced that the remark influenced the jury and contributed to the verdict. Further, much credit should be accorded to the good sense and fair-mindedness of jurors who have seen the evidence and heard the arguments, and have been instructed by the trial judge that arguments of counsel are not evidence. State v. Martin, 93-0285, p. 18 (La.10/17/94), 645 So.2d 190, 200.
Here, none of the remarks of the prosecutor appear to be so egregious to warrant a mistrial. The bulk of the State’s arguments were fair statements of the evidence admitted and the lack of evidence to corroborate the defense’s theory of the case. The comments about defense counsel were not personal attacks but references to defense counsel’s job performance.
There is no indication in the record that the prosecutor’s remarks so inflamed the jury that it influenced their verdict. Additionally, the record indicates that the jury was specifically instructed that opening statements and closing arguments were not to be considered as evidence and that anything the prosecutor and defense counsel said was simply argument.
*855 As to Mr. Williams’ argument that the State improperly highlighted his failure to testify, an indirect reference to a defendant’s failure to take the stand Isnwarrants a mistrial only when it is clear that the remark was intended to focus the jury’s attention on the defendant’s failure to testify. State v. Mitchell, 00-1399, p. 5 (La.2/21/01), 779 So.2d 698, 701. The jurors were informed of Mr. Williams’ constitutional privilege against self-incrimination and reminded of that privilege by the judge during jury instructions. Mr. Williams has failed to show any prejudice from the State’s rebuttal arguments.
Nevertheless, a trial court’s erroneous denial of a motion for mistrial' based on one of the provisions of La.C.Cr.P. art. 770 is subject to the harmless error analysis. State v. Whins, 96-0699, p. 8 (La.App. 4 Cir. 4/9/97), 692 So.2d 1350, 1355. Here, the testimony of an eyewitness, Mr. Sabil-lion, that he will never be able to forget Mr. Williams’ face because he was the man who killed his friend, even in the absence of Mr. Williams’ confession, proves his guilt. The State’s closing argument did not contribute to the verdict. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER VIII

Mr. Williams argues that the trial court violated La.C.Cr.P. art. 793 by allowing the jury to view Mr. Williams’ videotaped statement during deliberations.
During deliberations, the jurors sent a note to the judge asking to review Mr. Williams’ videotaped confession, the surveillance video, and the 911 call. The judge determined that the law allows the jury to view the confession and surveillance video in the jury room, subject to prohibitions against freeze framing, zooming, or manipulating the videos in any manner. However, defense counsel objected because he was concerned about the potential for manipulation. Thus, the judge decided to play the videos in the courtroom. At this juncture, the following colloquy occurred:
131 Judge: Well, those are the only options, [defense counsel]. So either you’re going to sit here and we’re going to play it with them for the next hour and half or the only other option is to allow a deputy to go in [the jury room] with those instructions [no freeze framing, zooming or manipulation] ... So what is your choice? Those are the only two options ... I have to let them see it. I think that the code article allows them to view it.
Defense Counsel: Right.
Judge: So if you have an objection — and I think it allows them to view it in the jury room.
Defense Counsel: Why don’t you do that and just note my objection.
Judge: No. It is my position if you have an objection, then I’m not doing it.
[[Image here]]
Judge: So I was going to play the 911 as they sit out here. They have to come out. So I need to put it on the record .... But as far as the video, I know that it was lengthy. So I was going to let it go in the back, as well. Have any objections?
Defense Counsel: I do, judge, I do think that we do object.
Judge: All right. So we’ll do it in open court?
Defense Counsel: Yeah.
As for the foregoing colloquy indicates, defense counsel did not articulate an objection to the jurors viewing the videos. Rather, the defense counsel objected to the jurors viewing the videos out of the presence of the court because of his fear *856 the jurors might manipulate the video. This exchange indicates that defense counsel acquiesced to the jury viewing the videos in open court.
In this case, the defense counsel failed to ñle a contemporaneous objection to the jury viewing the video in open court. The contemporaneous objection rule of La. C.Cr.P. art. 841(A) provides that “[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence,” and the party stated the grounds for the objection. State v. Richards, 99-0067, p. 4 (La.9/17/99), 750 So.2d 940, 942. The two purposes behind the contemporaneous objection rule |sj>are as follows: (1) to put the trial court on notice of the alleged irregularity or error, so that the court can cure the error; and (2) to prevent a party from gambling for a favorable outcome and then appealing on errors that could have been addressed by an objection if the outcome is not as hoped. State v. Knott, 05-2252, p. 2 (La.5/5/06), 928 So.2d 534, 535. Thus, this issue has not been preserved for appellate review.
Regardless, if the error had been preserved for review, Mr. Williams has failed to show how he was prejudiced by the jury re-viewing the confession during deliberations. The jury saw the confession video numerous times during trial, a few times at the request of defense counsel. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER IX

Mr. Williams argues that his life sentence without benefit of parole, probation, or suspension of sentence equates to cruel and unusual punishment.
The Eighth Amendment of the United States Constitution prohibits the infliction of “cruel and unusual punishments.” The Cruel and Unusual Punishment Clause circumscribes the criminal process in three ways: (1) it limits the kinds of punishment that can be imposed on those convicted of crimes; (2) it proscribes punishment grossly disproportionate to the severity of the crime; and (3) it imposes substantive limits on what can be made criminal and punished as such. Ingraham v. Wright, 430 U.S. 651, 667, 97 S.Ct. 1401, 1410, 51 L.Ed.2d 711 (1977).
The Louisiana Constitution likewise declares that no law shall subject any person to cruel, excessive, or unusual punishment. La. Const. Art. I, § 20. A sentence violates La. Const. Art. I, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless infliction of pain and suffering. State v. Smith, 01-2574, p. 4 (La.1/14/03), 839 So.2d 1, 6. A sentence |33is grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 01-0467, p. 11 (La.1/15/02), 805 So.2d 166, 174.
Mr. Williams argues that because he was a juvenile with mental retardation at the time of the shooting, his culpability for the crime is dramatically reduced.
However, Mr. Williams’ documented age was nineteen at the time he murdered the victim. He has no history of mental illness; he attended school without special education classes; he is not receiving government income (disability benefits); and he claims to have supported his children. The State’s experts found him competent to stand trial and capable of assisting counsel in his defense. The crime was perpetrated in a heinous and cruel manner. The defendant robbed the victim and in the process shot the unarmed victim, leaving him to bleed to death in the street.
*857 Mr. Williams was convicted of second degree murder, a violation of La. R.S. 14:30.1, which carries a mandatory sentence of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. The Legislature determines the length of the sentence imposed for crimes classified as felonies, and the courts are charged with applying these punishments unless they are found to be unconstitutional. State v. Armstrong, 32,279, p. 15 (La.App. 2 Cir. 9/22/99), 743 So.2d 284, 294. The assertion that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been rejected. See State v. Bunley, 00-0405, pp. 24-25 (La.App. 4 Cir. 12/12/01), 805 So.2d 292, 308; State v. Jenkins, 98-2772, p. 6 (La.App. 4 Cir. 3/15/00), 759 So.2d 861, 865. Further, a life sentence for an offender younger than Mr. Williams has been declared constitutional. See State v. |84 Jacobs, 07-887, p. 87 (La.App. 5 Cir. 5/24/11), 67 So.3d 535, 594 (life sentence for sixteen-year old defendant convicted of second degree murder was not excessive). Therefore, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER X

Mr. Williams argues that because the record is incomplete and has no perceived order, his rights to effective assistance of counsel, due process, and appellate review have been curtailed.
La. Const, art. I, § 19. provides that “[n]o person shall be subjected to imprisonment ... without the right of judicial review based upon a complete record of all evidence upon which the judgment is based.”
In felony cases, the recording of “all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel” is statutorily required. La.C.Cr.P. art. 843.
A slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal would not cause a reversal of a defendant’s conviction. State v. Allen, 95-1754, p. 11 (La.9/5/96), 682 So.2d 713, 722. Indeed, an incomplete record may nonetheless be adequate for appellate review. State v. Hawkins, 96-0766, p. 8 (La.1/14/97), 688 So.2d 473, 480; State v. Campbell, 06-0286, p. 99 (La.5/21/08), 983 So.2d 810, 872-73. A defendant will not be entitled to relief on the basis of an incomplete record absent a showing that he was prejudiced by the missing portions of the record. Campbell, supra.
Here, Mr. Williams has not identified the missing portion or portions of the record. The record contains opening and closing arguments, court minutes, all witness testimony and evidence introduced during the trial, including the | ^surveillance video, Mr. Williams’ confession, and the recording of the 911 call, as well as the transcription of the voir dire and objections lodged therein. Although, the record was not assembled in chronological or sequential order, it is complete for purposes of appellate review. Mr. Williams has failed to show that there are any material omissions from the trial transcript, or that he has suffered any prejudice because of the record’s lack of chronological order. Campbell, supra. Thus, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER XI

Lastly, Mr. Williams argues that “the combination of errors, arguably harmless in the singular instance, resulted in the *858 deprivation of due process of law, a fair trial, and a reliable sentencing determination.”
As discussed above, none of the alleged errors raised by Mr. Williams individually constitutes reversible error. The cumulative effect of alleged errors complained of by a defendant on appeal, none of which constitutes reversible error individually, does not deprive the defendant of his right to a fair trial, and thus does not constitute reversible error. See State v. Draughn, 05-1825, p. 70 (La.1/17/07), 950 So.2d 583, 629 (citing State v. Copeland, 530 So.2d 526, 544-545 (La.1988)). Further, the cumulative effect of harmless errors does not warrant reversal of a conviction or a sentence. State v. Tart, 93-0772, pp. 55 (La.2/9/96), 672 So.2d 116, 154. This assignment of error lacks merit.

MOTION TO DESIGNATE ATTACHED EXHIBITS

On September 9, 2013, Mr. Williams filed with this court a Motion to Designate Attached Exhibits as Part of the Record on Appeal. The exhibits are a single disc of Mr. Williams’ entire recorded statement, a transcript of that [^statement, and a statement from Carlos Sabillion[20] setting forth the terms of the deal he allegedly struck with the State in exchange for his cooperation in this case.
A court of appeal is a court of record, which must limit its review to evidence in the record before it. Board of Directors of Industrial Development Bd. of City of New Orleans v. All Taxpayers, Property Owners, Citizens of the City of New Orleans, 03-0826, p. 4 (La.App. 4 Cir. 5/29/03), 848 So.2d 740, 744 (citing La. C.C.P. art. 2164). An appellate court cannot review evidence that is not in the record on appeal and cannot receive new evidence. Littlejohn v. Quiram, 01-0075, p. 2 (La.App. 4 Cir. 10/24/01), 800 So.2d 73, 74.
The disc of Mr. Williams’ videotaped confession is already in the record on appeal in the form of three separate discs, broken down into pre-interview, main interview, and final statement. Thus, additional copies of the videotaped confession need not be attached. The transcription of the confession was not introduced at trial or shown to the jury, and thus this exhibit cannot be attached on appeal. Mr. Sabil-lion’s statement was not introduced at trial or made part of the formal record on appeal, and thus the transcription also cannot be attached on appeal. Thus, Mr. Williams’ Motion to Designate Attached Exhibits as part of the Record on Appeal is denied.

DECREE

For the foregoing reasons, Mr. Williams’ conviction and sentence for second degree murder of Selvin Gonzales is affirmed. Mr. Williams’ Motion to Designate Attached Exhibits as Part of the Record on Appeal is denied.
AFFIRMED; MOTION DENIED.
BELSOME, J., Dissents With Reasons.

.Two court-appointed psychiatrists called by the State, Dr. Raphael Salcedo and Dr. Richard Richoux, testified as to their opinion that Mr. Williams was competent to stand trial. Further, the defense’s expert, Dr. Jill Hayes, submitted a report on her opinion that Mr. Williams was mildly retarded based on his I.Q. test score of 63.

. State v. Williams, 12-0855 (La.App. 4 Cir. 6/11/12) {unpub.).

. State v. Williams, 12-1366 (La.6/15/12), 90 So.3d 445.

. This court denied Mr. Williams' writ application seeking review of this ruling. State v. Williams, 12-0908 (La.App. 4 Cir. 6/18/12) (unpub.)

. However, at this time neither Detective Packer nor Mr. Sabillion knew Mr. Williams' name.

. Before trial, two defense representatives, one of whom spoke Spanish, came to Mr. Sabillion’s residence and took a signed statement from him in which he disclosed the State’s offer to help him. At the time he gave the statement, he believed he was speaking to a police representative. Later, a defense representative revisited Mr. Sabillion and requested that he withdraw the charges. Mr. Sabillion refused to do so because the victim was his friend.

. Detective Packer explained that the three videos were actually one continuous interview with Mr. Williams, separated into three discs because the approximately one hour and thirty minute interview could not be recorded on one disc.

. The fact that the victim had been shot by a .380 caliber weapon had not been released to the media or the public.

. Dr. Salcedo explained that an I.Q. of sixty-nine and below is considered the beginning of the mild mentally retarded range.

. McNaughten's Case, 1 Car. & K. 130 (1843).

. La.C.Cr.P. art. 703(G) provides:
When a ruling on a motion to suppress a confession or statement is adverse to the defendant, the state shall be required, prior to presenting the confession or statement to the jury, to introduce evidence concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement.
A ruling made adversely to the defendant prior to trial upon a motion to suppress a confession or statement does not prevent the defendant from introducing evidence during the trial concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement.

. See also Crane v. Kentucky, 476 U.S. 683, 689. 106 S.Ct. 2142. 2146. 90 L.Ed.2d 636. 689 (1986) ("[Rjegardless of whether the defendant marshaled the same evidence earlier in support of an unsuccessful motion to suppress, and entirely independent of any question of voluntariness, a defendant’s case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubts on its credibility.”); State v. Williams, 01-1650, p. 8 (La.11/1/02), 831 So.2d 835, 843 (holding that the statutory rule of La.C.Cr.P. art. 703(A) which permits the defendant to introduce evidence at trial as to the circumstances surrounding his confession "has its underpinnings in the Due Process Clause and it necessarily operates independently of any credibility determinations the trial court made in ruling on the volun-tariness of the statement as a matter of law.”).

.The defendant’s confession was played in whole and in part numerous times during the trial.

. On cross examination, it was established that the date was January 19, 2012.

. During trial, defense counsel referred to the statement as Defense Exhibit 1 and showed the document to Mr. Sabillion during cross examination. However, the record shows that the defense never introduced the statement into evidence.

. Batson has been codified in Louisiana Law under La. C.Cr.P. art. 795(C), as follows:
No peremptory challenges made by the state or the defendant shall be based solely upon the race of the juror. If an objection is made that the state or defense has excluded a juror, solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory racially neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.

. Although defense counsel requested the State’s reasons for rejecting West, Washington and Ballard, the trial court denied the Batson challenge, stating it recalled the responses of those jurors. (West said he did not approve of police lying to a suspect. Washington said police have been known to "trick” defendants into confessing. Ballard said he served on a jury but could not recall any details.)

. La.C.Cr.P. art. 795(C) permits a trial judge to note a race-neutral reason for a peremptory challenge based upon the voir dire examination of a juror. See n. 16, supra.

. This case is distinguishable from State v. Bender, 12-1682, p. 1 (La.App. 4 Cir. 7/17/13), 120 So.3d 867, 868, writ granted, 13-1794 (La.3/14/14), 2014 WL 1316265, in which this court reversed the defendant’s conviction finding the district court erred in accepting the State's use of a juror’s prior convictions as a race-neutral reason for a peremptory strike during a Batson challenge. In this case, the prosecutor referenced Mr. Jackson’s arrest record as a reason for the peremptory strike; however, the prosecutor also stated that Mr. Jackson did not engage in conversation with the State or the defense, thus providing another race-neutral reason for the peremptory strike.

. Although the defense asserts the statement is from Carlos Sabillion, the statement is signed "Carlos Gonzales M.”